In re **FIRST BARNSTABLE CORPORATION, Debtor.**

**Bankruptcy No. 89–12653–JNG.**

United States Bankruptcy Court,
D. Massachusetts.

Nov. 9, 1989.

Peter Haley, Gordon & Wise, Boston, Mass., for debtor.

Steven Weiss, Cooley, Shrain, Alpert, Labovitz & Danbrov, P.C., Springfield, Mass., for movant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### I. INTRODUCTION

The matter before the Court is the amended motion of Berkshire County Savings Bank ("Bank") for relief from the automatic stay imposed by § 362 of the Bankruptcy Code. The Bank seeks relief from stay pursuant to §§ 362(d)(1) and 362(d)(2) of the Code so that it may proceed to foreclose on its mortgage and security interests in the Debtor's property—the Park Beach Ocean Resort and its contents. The Debtor's bankruptcy petition was filed on September 7, 1989, one day before the Bank's scheduled foreclosure sale. The Court scheduled a preliminary hearing on the Bank's motion on September 13, 1989. A final evidentiary hearing was commenced on October 11, 1989 and concluded on October 30, 1989.

### II. FACTS

During the course of the evidentiary hearing, six witnesses testified and 19 exhibits were introduced into evidence. With respect to the Bank's debt and other encumbrances on the property, the following exhibits were moved into evidence without opposition: 1) municipal lien certificates dated September 19, 1989, totalling $35,032.19; 2) a note, dated May 16, 1986, executed by Robert M. Shields, Sr., as Trustee of the Park Beach Trust, in the original principal amount of $1,800,000 made payable to the Bank; 3) a Loan Modification Agreement, dated March 30, 1988, executed by Robert M. Shields, Sr., as Trustee of the Park Beach Trust; 4) a First Modification to Promissory Note, dated October 3, 1988, executed by Robert M. Shields, Sr., as Trustee of the Park Beach Trust; 5) a Security Agreement, dated May 16, 1986, and associated financing statements; 6) a mortgage, dated May 16, 1986, granted by the Park Beach Trust to the Bank; 7) a Second Mortgage Security Agreement, Financing Statement and Assignment of Rents, dated March 24, 1987, executed by Miriam Sprague as Trustee of the Park Beach Trust and as President and Treasurer of Park Beach Hotel, Inc., in favor of Robert M. Shields, Sr., in the original principal amount of $2,640,000, and 8) a mortgage dated August 21, 1989, executed by William L. Shields, Jr., on behalf of the Debtor corporation, in the original principal amount of $1,500,000.

The first witness, Richard J. Dennis, Sr., a qualified real estate appraiser, described the resort property and gave an opinion of it's value. His report, which was introduced into evidence, also contains a detailed description of the property, as well as several recent photographs. As stated by Mr. Dennis either in his testimony or in his report, the resort is comprised of a 50 unit, two-story motel and swimming pool, located at 241 Grand Avenue in Falmouth Heights, Massachusetts. It is located across Grand Avenue from a sandy beach and the Atlantic Ocean. The Debtor owns and manages the resort, in part a timeshare facility, and in part as a resort hotel.

Mr. Dennis testified that he conducted his appraisal in March of 1989 and prepared his appraisal report in April. He opined that the fair market value of the property on April 5, 1989 was $2,500,000, less costs of necessary refurbishing, based upon comparable sales at or about the time of his analysis. He indicated that the real estate market for both residential and commercial properties on Cape Cod is in "considerable disarray" and that between April 5, 1989 and the date of his testimony the "market has continued to soften." Mr. Dennis also indicted that in his opinion the highest and best use for the property was as a motel or a hotel facility, although he did examine the property in terms of its potential as a timeshare facility. Mr. Dennis testified that the market for timeshares is in disarray, that there is no resale market for timeshares, that marketing costs for timeshares are extraordinarily high, running between 40 and 60 percent of sales prices, and that the deferred benefit from converting the hotel to a facility devoted exclusively to timeshares could take a great deal of time due to market absorption and the amount of capital needed to renovate the units for sale as timeshares.

Mr. Dennis also testified about an issue raised in his report, namely whether the Debtor corporation has authority to sell timeshares at the Park Beach Ocean Resort. Dennis indicated that, on November 11, 1986, the Town of Falmouth Board of Appeals considered an application filed by Frederick O. Sprague for a special permit to convert the motel to a condominium for timesharing or a variance to allow the existing units to be timeshared as motel units. Dennis noted that the application was allowed subject to certain conditions. These conditions included: 1) a requirement that the resort be closed for 16 consecutive weeks during the year with the first week including the first of December; 2) a requirement that there be no exterior or interior changes made to the existing motel; and 3) a requirement that the right to create the timeshare complex be exercised only by the petitioner (i.e., Frederick O. Sprague), acting individually or as a trustee of a Massachusetts business trust.

The second witness to testify on behalf of the Bank was Stuart Bornstein, the president, chief operating officer and sole shareholder of Nantucket Land and Mortgage Company, Inc., a mortgage lending company. Bornstein indicated that the Nantucket Land and Mortgage Company is a co-mortgagee on a third mortgage on the Park Beach property. The mortgage document which was introduced into evidence indicates that the Debtor corporation, by its Vice President and Treasurer William L. Shields, Jr., granted Nantucket Land and Mortgage Company, Inc., First Security Mortgage Corporation and Stephen C. Jones, Trustee of Oasis Realty Trust a mortgage on the Park Beach property in the amount of $1,500,000 on August 21, 1989, about two weeks before the Debtor's bankruptcy petition was filed.

Bornstein testified about his discussions with the Bank regarding offers he made to purchase the Bank's note and mortgage. He indicated that he made an original offer of $1,650,000 and a subsequent offer of $1,700,000. According to Bornstein, he was willing to pay the Bank its principal in full since he felt his company would have "plenty of equity at the 1.7 with no worries." He added that he believed the property to be "an irreplaceable piece of merchandise that could return a lot of money to the owners." He valued it at between $3,100,000 and $3,600,000 at the time he made his offers.

Contrary to Dennis' testimony, Bornstein was impressed with the property's potential as a timeshare resort. Indeed, his analysis left the Court will little doubt that Bornstein had anticipated huge profits on the venture had he been able to close a deal with the Bank. Despite his admission that his third mortgage was probably voidable as a preference,[1] Bornstein insisted that, in his view, the property was worth $8–12 million, presumably in the long run.

The Bank's third and final witness was Michael P. Daley. Mr. Daley testified that he is a vice president of the Bank and the individual responsible for the recovery of sums lent to the Park Beach Trust. To expedite the trial, portions of Mr. Daley's affidavit were allowed into evidence.

Mr. Daley's affidavit reveals that the Park Beach Trust borrowed money from the Bank on May 16, 1986. The note evidencing the loan was secured by a first mortgage on the Park Beach property and a first security interest in all the other assets. The note matured in November of 1987, but the Park Beach Trust was unable to make payment. The Trust, through Robert M. Shields, Sr., requested an extension of time for payment until August 15, 1988 to allow the Trust to sell timeshare contracts to various local finance companies. The Bank agreed to the extension and a Loan Modification Agreement was executed on or around March 18, 1988. It is noteworthy that on that date, the Park Beach property was conveyed to Grant Avenue Corporation for a consideration of all outstanding obligations. On May 13, 1988, the property was conveyed to Park Beach Ocean Resort, Inc. In August of 1988, another extension was requested, this time until November 15, 1988. The Bank again agreed and entered into a written agreement entitled First Modification to Promissory Note. The modifications included the capitalization of all accrued interest and an agreement that "[d]uring the term of the Note, as modified herein, the Bank shall have no obligation to grant to Borrower releases of any condominium unit of the property secured by the mortgage." The Park Beach Trust failed to pay the Note as modified on November 15, 1988. Indeed, the Bank has received no payments since May of 1988, except for a Court ordered adequate protection payment of $15,000.

The Bank commenced foreclosure proceedings as a result of the continuing defaults in November or December of 1988. On April 15, 1989, the property was conveyed to First Barnstable Corporation. Subsequently, the Debtor requested that the foreclosure sale be halted and that the obligation be extended until September 30, 1989. In reliance on various promises, the Bank delayed its scheduled foreclosure sale. However, the Bank went ahead and scheduled a foreclosure sale for September 8, 1989, when the promises were not fulfilled.

Daley testified that the principal amount owed to the Bank is $1,776,500, that the current accrued interest totals $217,436.60, that late charges total $11,441.08, that legal fees as of October 11th total $40,-749.69, that the auctioneer has been paid $4,475 and that insurance has been procured for the property at a cost of $12,-191.16. Daley indicated that an appraisal fee had also been paid, but he could not recall the amount.

At the conclusion of the Bank's case, the Debtor called William L. Shields, Jr., the Debtor's vice president and a cousin of Robert M. Shields, Sr., Trustee of Park Beach Trust. William Shields testified that the Debtor gave Robert Shields a promissory note in the amount of $1,500,000 in April or May of 1989. He then indicated that the mortgage granted to Nantucket Land and Mortgage Co., Inc. and others in August of 1989 was intended to secure that note, pursuant to a transaction that the Court, based upon the testimony, is unable to understand.

Shields also testified that 310 timeshare holders were currently using the property and making payments (contract payments and/or maintenance payments) to the Debtor. Shields subsequently amended his tes-

---

1. The witness stated that his $500,000 one-third interest in the third mortgage position was related to "a mortgage that was owed on another piece of property that I released for less money and I took the shortfall and put it on the Park Beach property."

timony, stating that there were in fact 302 timeshare contracts held by the Debtor, which contracts were either entered into by the Debtor, rewritten by the Debtor, or assigned by Park Beach Ocean Resort, Inc. to the Debtor. Shields indicated that First Barnstable Corp. was responsible for 90 new contracts. He testified that the Debtor's inventory of timeshare units consisted of 328 units in Phase I with a value of $2,232,370, and 658 units in Phase II with a value of $5,630,500.

Shields indicated that he believed end paper (the contracts signed by timeshare purchasers) could be sold for 97 percent of its face value with a 10 percent holdback for one year as long as "the paper is matured by three months and the property is secured." He also stated that the face value of the paper now held by the Debtor was approximately $850,000. Although Shields testified that the Debtor had not been engaged in selling timeshare weeks post-petition, he stated that a pool of approximately 300–350 potential purchasers existed as a result of the demise of the Sand Dollar Motel in Hyannis, a property in which Robert M. Shields, Sr. has an interest. Shields indicated that virtually all Sand Dollar timeshare purchasers who have been contacted expressed an interest in transferring to the Park Beach Resort, assuming they are given credits for what they had already paid and are able to obtain a similar week at the Park Beach Resort. In his view, sales of the 328 units remaining in Phase 1 to these individuals could generate about $1,800,000, an amount significantly less than the $2,232,370 value given by the Debtor to the remaining inventory, because of the monies previously paid by these purchasers that would have to be credited.

Shields admitted that, to the extent the Debtor honors timeshare contracts entered into by the prior owners of the property or by the owners of the Sand Dollar, and does not receive any of the monies paid by the timeshare purchasers to the prior owners, there would be no net gain for the Debtor, unless the purchases were financed. Additionally, Shields indicted that he had no idea what happened to the monies paid to the prior owners of the Park Beach Resort by timeshare purchasers before the Debtor's acquisition of the property.

Shields admitted that he had no answer to the question of how much time it would take to sell the 328 units remaining in Phase I, and he admitted that it would take a substantial outlay of materials and labor (approximately $370,000) to convert Phase II to timeshare units. Additionally, he could not say how the Debtor would be able to pay its real estate taxes. Shields also admitted that the Public Offering Statement dated June 1, 1989 issued by the Debtor contains no reference to the Bank's foreclosure action, although the Statement does provide that, "[i]t is anticipated by the developer [i.e., First Barnstable Corp.] that this mortgage will be satisfied in full on or before October 30, 1989, or that partial releases will be granted by the first mortgagee allowing for the timely recording of the interval unit deeds." Shields indicated he was unaware that the Real Estate Time–Share Act, see Mass. Gen.Laws Ann. ch. 183B, § 51 (West 1989), requires recordation of timeshare deeds within five days of the completion of performance by the purchasers.

Finally, Shields testified that the assessed value of the property by the Town of Falmouth is $3,400,000, and that the amount outstanding on the second mortgage, which was assigned by Robert M. Shields, Sr. to Connecticut Bank and Trust, is approximately $950,000.

The testimony of William Egan, the Debtor's General Manager and Sales Director clarified Shields' testimony. Egan indicated that the Debtor was holding paper with a total remaining principal balance of $830,255.71. In support of this testimony, the Debtor introduced as Exhibit 3 an accounts receivable list containing the names of 270 purchasers, the unit number and week number purchased, the date of the purchase, the amount of the down payment, the amount financed, if any, and the principal balance on the contract, the payment status, the interest rate and the term. He also indicated that the delinquency rate on payments was very low—less than 1.5%. Like Mr. Shields, he could not say where the cash paid by timeshare purchasers to the Debtor's predecessors went. However,

he was able to estimate that it would take until July, 1990 to sell the remaining inventory. He also added that the Debtor had 28 contracts that were unsigned but ready to close, so that approximately $143,000 could be added to the $830,255.71. He also stated that the Debtor was holding approximately $44,000 in escrow as a result of monies received from customers since the filing.

The final witness was John Meldon, a mortgage banker and broker. He testified that he had been working with the Debtor and the prior owners of the Park Beach Resort to obtain a commitment to buy the end paper, which he described as highly desireable, consumer paper due to its short term and attractive rate. He stated that the discount rate applicable to the paper would be 85 to 90 percent of the face amount of the paper. However, Meldon indicated that it could take three months to obtain a commitment. Although he recognized the dramatic changes in the real estate market on Cape Cod, he indicated that there was a "pretty good possibility" of getting a commitment. He added that "I hope and I think that it's a project that can get financed."

At the conclusion of the hearing and in rebuttal, counsel to the Bank, by way of an offer of proof to which Debtor's counsel had no objection, made the following points based upon the individual timeshare contracts that were produced, but not submitted into evidence. Counsel to the Bank noted that out of 110 contracts entered into between timeshare purchasers and First Barnstable Corporation or its predecessors, 52 were either not notarized or witnessed as required by state law for recordation. Twenty-nine Sand Dollar contracts were similarly deficient. *See* Mass. Gen. Laws Ann. ch. 183B, §§ 29, 30 (West 1977 and Supp.1989).[2]

## III. DISCUSSION

Pursuant to § 362(d) of the Bankruptcy Code, the Court is required to grant relief from stay to a moving party "for cause,

including the lack of adequate protection of an interest in property," or "if the debtor does not have any equity in the property and the property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(1) and (d)(2). Section 362(g) sets forth the respective burdens of proof for the moving party and the party opposing relief. The moving party has the burden of proof on the issue of the debtor's equity in the property and the party opposing relief has the burden of proof on all other issues. 11 U.S.C. § 362(g).

In *United Savings Association of Texas v. Timbers of Inwood Forest, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court examined the requirements of section 362(d)(2). It stated:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

108 S.Ct. at 632.

### A. Equity in the Property

The Bank argues that it has satisfied its burden of proof on the issue of the Debtor's lack of equity. According to the Bank the following encumbrances must be viewed in relation to the appraised value of $2,500,000 less costs of rehabilitation:

| | | | |
|---|---|---|---|
| 1) Municipal liens | – | $ 35,032.19 | |
| 2) First mortgage | – | $2,062,793.30 | |
| 3) Second mortgage | – | $ 950,000.00 | (approx.) |
| 4) Third mortgage | – | $1,500,000.00 | |
| | | $4,547,825.49 | |

Clearly, if the Court accepts the Bank's figures, the Bank has met its burden of proof.

■ The Debtor counters that the value of the property is at least $3,400,000, the assessed value. It also argues that the third mortgage in the amount of $1,500,000

---

**2.** Counsel to the Bank also pointed out that the Debtor's predecessors obtained $1,020,333 from timeshare purchasers who paid cash for their units, *see* Debtor's Exhibit 4, and that the Debt-

or's cash flow statements do not reflect the adequate protection payment ordered by the Court.

must be excluded from the calculation because the evidence established a prima facie case of a preference with respect to that mortgage.

The Court is convinced that the third mortgage may well be voidable, and, therefore, should not be considered as an encumbrance for purposes of this hearing only. The testimony and documentary evidence established that the mortgage was granted within 90 days of the filing for an antecedent debt and no money was contemporaneously advanced in exchange for the mortgage. However, the valuation of the property presents a more difficult issue.

■ The Court finds that the appraisal prepared by Mr. Dennis must be given considerable weight due to Mr. Dennis' impressive credentials and wide experience in the appraisal field. Mr. Bornstein's testimony as to the value of the resort must be weighed against what he was actually willing to pay to acquire an interest in the property, i.e., $1,700,000. Moreover, the Court can give no weight to what the property may be worth two or three years from now after the expenditure of considerable time and money to convert the entire facility for timeshares. With respect to the assessed value, the Court again finds that it must be given little weight. The Court was simply presented with a bald number with no testimony as to how the figure was reached. Accordingly, the Court finds that the resort has a fair market value today of $2,500,000, and, therefore, the Debtor has no equity in the property.

### B. Property Essential for an Effective Reorganization that Is in Prospect

The Debtor argues that the resort is necessary to an effective reorganization. It highlights the fact that the case is just two months old and that there exists approximately $830,000 in end paper with less than a 1.5 percent delinquency rate that can be sold. Additionally, the pool of potential purchasers from the Sand Dollar leads the Debtor to the conclusion that there is a reasonable likelihood of an effective reorganization.

The Bank and the Court, however, note the following negative considerations affecting the prognosis for a successful reorganization in this case within a reasonable time: 1) the fact that neither the Debtor nor its predecessors have been able to sell timeshare paper since 1987; 2) the existence of loan modification agreement which precludes partial releases that are a prerequisite to the sale of the end paper; 3) the fact that a large portion of the consumer end paper is not notarized or witnessed; 4) the fact that the rights granted by the Board of Appeals permit appear to be restricted to Frederick O. Sprague or a Massachusetts business trust in which he is a trustee; 5) the high cost of marketing and selling timeshares in a depressed market, particularly during the late fall and winter season when the resort must be closed; 6) the length of time it will take to market the remaining timeshare inventory (i.e., at least eight months according to William Egan); and 7) the uncertain ability of the Debtor to sell the end paper at all due to the state of the real estate market on Cape Cod, a fact noted by Mr. Meldon in his testimony.

While the Court is sympathetic to the timeshare purchasers' argument that a reorganization presents the only hope for them to recover monies they have expended, the Court, using the *Timbers* test, is unable to find that the Debtor has any prospect of reorganizing within a *reasonable* time. The Debtor has presented the Court with little more than gossamer threads of hope. Without the ability to obtain a commitment to purchase the end paper within a *short* period of time, and particularly in view of the fact that the Bank will not grant partial releases to allow a purchaser of the end paper to secure that purchase, a reorganization is simply not feasible now or three months from now.

### C. Adequate Protection

The Debtor offered the Bank adequate protection in the form of an equity cushion and an assignment of the end paper that it is currently trying to sell. In view of the fact that the Bank's debt is in excess of $2,000,000, that the Bank has received no payments in over a year, except for one Court ordered adequate protection pay-

ment, and that its note is matured, the Court finds that an equity cushion alone is insufficient. Moreover, the assignment of the end paper does not add anything to the offer. In the Court's view a minimum offer of adequate protection would have been the monthly payment of interest at the contract rate, an offer the Debtor apparently could not or would not make.

## IV. CONCLUSION

In view of the foregoing, the memoranda and arguments of counsel, the Court hereby allows the Bank's motion for relief from stay pursuant to section 362(d)(1) and (d)(2) of the Bankruptcy Code.

SO ORDERED.